IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Farm Labor Organizing Committee, AFL-CIO     Case No. 3:09 CV 2865
and the Ohio Immigrant Worker Project,

                                      MEMORANDUM OPINION
                      Plaintiffs,      AND ORDER

           -vs-                               JUDGE JACK ZOUHARY

United States Border Patrol,

                        Defendant.

## BACKGROUND

Plaintiffs Ohio Immigrant Worker Project ("IWP") and Farm Labor Organizing Committee ("FLOC") allege Defendant United States Border Patrol, Customs and Border Protection ("CBP") maintains a policy, pattern and practice of targeting Hispanic individuals in conducting stops, detentions, interrogations and searches. Plaintiffs point to specific incidents of alleged racial profiling by the Sandusky Bay Detroit Sector ("SBY") station, and seek declaratory and injunctive relief under the Fourth and Fifth Amendments.

This Court held a bench trial in June 2015 and reviewed post-trial briefing (Docs. 243–44). Pursuant to Federal Civil Rule 52(a), this Court makes the following findings of facts based on the preponderance of the credible evidence presented at trial, as well as the pre- and post-trial filings.

## FINDINGS OF FACT

### Ohio Immigrant Worker Project and Farm Labor Organizing Committee

Plaintiffs are nonprofit membership organizations that advocate on behalf of migrant workers. Plaintiffs initiated this action on their own behalf, and on behalf of their members, to "challenge the institutional practice of profiling our people, perpetuating inequity, not allowing us to defend

ourselves, and advocate for full due process of all our people, whether they're documented or not, and defend their labor rights, regardless of their status" (Doc. 236 at 121–22).

IWP was founded in 1998 with the mission to "walk in solidarity with the world's immigrants and farm workers, empower them to take full . . . presence in both the economic, social and cultural level in the United States" (*id.* at 175–76). IWP has approximately 3,800 members in Ohio. Over eighty percent of its members are rural immigrants and farm workers, and eight-five to ninety percent of those members identify as Hispanic (*id.* at 178–79, 208). IWP has five principal areas of focus: leadership development, education, workplace rights, cultural celebrations, and immigration (*id.* at 180–82). IWP is funded through donations and grassroots fundraising from churches and foundations (*id.* at 176).

FLOC was founded in 1967 by Baldemar Velasquez and his father (*id.* at 115). FLOC's mission is "to form and comprise a Union of people to work for the betterment of farm workers . . . and all other persons, regardless of race, color, citizenship, age, sex, creed, place of national origin, who for any reason have been excluded from full enjoyment of social, economic and political rights" (*id.* at 121–22; Ex. 110). All FLOC members identify as Hispanic, and are either of Mexican or Mexican-American heritage (Doc. 236 at 120).

**United States Border Patrol, Customs and Border Protection**

CBP is a federal law enforcement agency created by regulation to execute border enforcement powers authorized by the Immigration and Nationality Act. CBP is primarily responsible for patrolling international border areas between Ports-of-Entry, including the 158-mile stretch between Ohio and Canada (Doc. 232 at 5). CBP's mission is to gain operational control of the Nation's border by: apprehending terrorist and terrorist weapons illegally entering the United States; deterring illegal entry through improved enforcement; detecting, apprehending and deterring smugglers of humans,

2

drugs and other contraband; and reducing crime in border communities and improving quality of life (Ex. 17 at 3–4; *see* Ex. 138 at 8). All CBP agents are required to speak Spanish and generally spend some period of time, after the academy, training on the southern border (Doc. 241 at 80; Ex. 17 at 10).

Following the September 11, 2001 terrorist attacks, CBP reassessed its strategy for protecting the northern border. In February 2009, CBP opened SBY to create a permanent CBP presence in northern Ohio (*see* Doc. 237 at 103–08; Ex. 21). SBY's Primary Operational Domain, where the station patrols, stretches from the international line in the middle of Lake Erie south to the Ohio Turnpike, and from Lucas County east to Cuyahoga County (Doc. 237 at 9–10; Ex. 21 at 5–6; Ex. 23).

CBP agents generally encounter individuals in one of two ways: the agent makes direct contact with the individual during the agent's patrol activities; or the agent's encounter is precipitated by an earlier interaction between the individual and local law enforcement officers. In the second scenario, referred to as an "Other Agency (OA) Stop," a third-party law enforcement agency, such as municipal police or highway patrol, stops an individual and requests CBP's assistance at the scene (Doc. 237 at 117–18). Prior to November 2012, CBP responded to requests from other law enforcement agencies to translate for Spanish speaking suspects (Doc. 242 at 21–22). After that date, CBP adopted a policy that requests from other law enforcement organizations for CBP assistance "based solely on a need for language translation, absent any other circumstance" would be referred to an approved list of translation services (Ex. 134). At present, SBY provides translation assistance strictly relating to identification of a subject (Doc. 237 at 6; Doc. 242 at 21–22).

A CBP agent's encounter with an individual generally begins as a "consensual encounter," whereby an agent approaches an individual and initiates a non-threatening, "casual conversation." The interaction is voluntary and the individual is free to walk away at any point (Doc. 237 at 13; Doc. 242 at 14). An "immigration inspection" occurs when a CBP agent asks about citizenship and lawful

3

right to be in the United States.  An immigration inspection may be part of a consensual encounter so long as the person feels free to leave, or may be part of a stop (Doc. 237 at 13–15; Doc. 241 at 54; Doc. 242 at 14–15).

SBY has a policy of documenting all apprehensions, but not all consensual encounters or pedestrian stops (Doc. 237 at 54–55).  An I-213, referred to as a Record of Deportable/Inadmissible Alien, is CBP's form for documenting the arrest of a known or suspected alien without lawful status in the United States (*see, e.g.*, Ex. 31).  An I-213 is generated only when a stop leads to an arrest (Doc. 237 at 65).  If a state law enforcement agency has previously apprehended and detained an individual, CBP will prepare an I-247, known as an immigration detainer, if CBP determines there is probable cause to believe the individual is removable (Doc. 232 at 7).  CBP will prepare an I-44 to document an arrest or seizure where an individual or contraband is turned over to another agency (Doc. 237 at 84–85). If a stop or encounter does not result in an apprehension, detainer or seizure, but does involve a vehicle, CBP will document the stop in a Vehicle Stop Memorandum (*see, e.g.*, Ex. 132).

SBY maintains a "Daily Apprehension Log," which compiles information from SBY agents' apprehension reports (I-213's, I-44's, etc.).  The Apprehension Log catalogues the suspect's name, gender, age, nationality, approximate location of the interaction ("Arrest Landmark"), and whether the individual was initially encountered by CBP itself ("PB" in the log) or another agency ("OA" in the log).  As part of discovery in this action, Defendant produced Apprehension Logs from October 1, 2008 until June 17, 2014 (Exs. 25–27).  The parties stipulate the Apprehensions Logs contain data on all apprehensions, but not all encounters, recorded by SBY during the relevant time period (*see* Doc. 232 at 9).

4

**Individual CBP Encounters**

This Court heard testimony from nine Hispanic individuals regarding eight encounters with CBP agents. This Court also heard testimony from five of the agents involved in those encounters.

*Willian Bautista-Morales.* Bautista, an IWP member, arrived in the United States in 2006 from Mexico (Doc. 236 at 27–28, 35; Ex. 1 at 3). Bautista is a native Spanish speaker and has limited ability speaking and understanding English (Doc. 236 at 45–46). Bautista testified regarding two interactions he had with CBP agents. Both encounters were OA Stops, where local or state police requested CBP's assistance at the scene of a traffic accident.

On May 21, 2010, Bautista received a phone call from a friend who had been in a car accident, asking Bautista to come to the accident site in Wakeman, Ohio. Bautista and two others drove to the accident site in a green Ford Explorer bearing Wisconsin license plates. They parked in the lot of a pizza restaurant located on the same street as the accident site. When Bautista exited his car, a highway patrol officer instructed him to wait behind his car and asked about his "documents" (*id.* at 29–32). Bautista presented a New Mexico driver's license. The highway patrol officer was speaking in English; Bautista responded in Spanish with the assistance of a friend who was translating for him (*id.* at 61–62, 65–66). Highway patrol requested CBP assistance to translate and identify the subjects at the location (Ex. 1 at 2). Bautista waited approximately ninety minutes for CBP to arrive. He would have left had highway patrol not instructed him to stand behind his car (Doc. 236 at 29–32). When CBP Agent Matthew Rosenberg arrived, he reviewed Bautista's identification and determined Bautista was illegally present in the United States. Rosenberg took Bautista into custody for further processing (*id.* at 34; Ex. 1).

On June 17, 2014, Bautista was working for Corso's Landscape and arrived at a BP gas station in Huron, Ohio, to mow the lawn. While Bautista was parking the Corso's truck, another motorist

5

accused Bautista of hitting his car with the Corso's truck.  The driver called the Huron Police.  A police officer arrived and asked for Bautista's identification (Doc. 236 at 42–44).  Bautista claimed to have a New Mexico driver's license, but could not produce it.  He eventually produced a digital image of his license, which was determined to be invalid, and a U.S. Customs and Immigration Employment Card authorizing him to work in the United States (Ex. 2 at 2).  The police officer called CBP for assistance identifying Bautista and translating for him (Ex. 4 at 2–3).  CBP Agents Bradley Shaver and Patrick Barron verified Bautista's work permit (*id.* at 3; Doc. 238 at 166).  The police officer issued Bautista a traffic citation for no operator's license and, with Barron's translation assistance, explained to Bautista he needed to obtain an Ohio driver's license since he had established residence in Ohio (Ex. 2 at 2).

These were Bautista's only encounters with CBP (Doc. 236 at 83).  Bautista has been "affected morally" by his experiences with CBP.  He feels intimidated when he sees a CBP agent and is less likely to travel (*id.* at 51–52).

*Edson Perez-Perez.*  Perez-Perez, an IWP member, arrived in the United States from Mexico in 2013 (*id.* at 89; Ex. 4 at 4).  Perez-Perez works at Corso's Landscape and was with Bautista at the BP gas station on June 17, 2014.  While Bautista was speaking with the Huron Police Officer, Perez-Perez and another co-worker walked down the street to an ice cream shop to buy lunch and wait for Bautista (Doc. 236 at 90–91).  From where Bautista was standing with the Huron police officer, he could see Perez-Perez at the ice cream shop (*id.* at 45).

When CBP Agents Bradley Shaver and Patrick Barron arrived at the gas station in response to the request from Huron Police to assist with Bautista, the police officer advised there had been two other subjects who walked away in an unknown direction (Doc. 238 at 166–67; Ex. 4 at 3).  Shaver asked Bautista where his co-workers went and whether they were legally present in the United States.

6

Bautista said he did not know (Doc. 236 at 49–50). In Shaver's experience, when there are multiple people at an accident scene and they learn from local police that CBP is coming and decide to leave, they are avoiding CBP because they are concerned they will be deported (Doc. 238 at 167–68, 192).

When the CBP agents left the BP station, they observed Perez-Perez and his co-worker at the ice cream stand (Ex. 4 at 3). Perez-Perez was wearing a Corso's work uniform (*id.*; Doc. 236 at 80; Doc. 238 at 171). Shaver knew, based on his law enforcement experience, that Corso's had a history of hiring undocumented workers (Doc. 238 at 172). Shaver approached Perez-Perez and his co-workers and initiated a consensual encounter in English, greeting them and asking if they had been involved in the gas station accident (Doc. 236 at 97; Doc. 238 at 171). Perez-Perez did not respond, so Shaver repeated the questions in Spanish. Perez-Perez acknowledged he had been with Bautista, at which point Shaver initiated an immigration inspection to identify them (Doc. 238 at 171–72). Perez-Perez presented his Mexican voter registration card (Doc. 236 at 95–96; Ex. 4 at 3). He admitted he was illegally present in the United States without any immigration documents permitting him to be in, remain in, or pass through the United States (Doc. 236 at 110; Ex. 4 at 3). Shaver arrested Perez-Perez (Ex. 4).

This was Perez-Perez's only encounter with CBP (Doc. 236 at 101).

*Jose Montez-Ramirez.* Ramirez is a United States citizen, and is not a member of either Plaintiff organization (Doc. 238 at 3, 18). On August 8, 2012, Ramirez was in Toledo, Ohio, driving his father's 2001 Dodge Ram van with tinted windows (*id.* at 4, 16). Ramirez was on his way to Belle Tire when he stopped to pick up his sister and drop her off at their grandmother's house (*id.* at 5–8).

CBP Agent Thomas Payne was patrolling an area of North Toledo known for human trafficking when he observed Ramirez driving the van with his sister in the passenger seat. Based on Payne's experience, seeing a young male driving such a large vehicle, particularly when there is a

young female passenger, fits the characteristics for sex servitude. Payne lost sight of the van, but saw it again near some trailers. The vehicle was driving away with the passenger door open (Doc. 241 at 101–02). The vehicle's tinted side and rear windows made it difficult to see inside from a distance (Doc. 238 at 28–29). Payne lost sight of the van a second time, but spotted it again about fifteen minutes later. Payne eased behind the van and when Ramirez turned into a side street, Payne pulled behind him. The rear of the CBP cruiser was sticking out onto the main road, so Payne activated the cruiser's back flashers to alert oncoming traffic that the cruiser was stopped (Doc. 241 at 103–04). Payne approached Ramirez, asked for his identification, and inquired where he was coming from and going to, where he attended school, and whether he was employed. Ramirez presented a valid driver's license and was cooperative in answering questions. Payne never asked Ramirez any immigration questions, handed back his identification, and told him to "have a nice day" (*id.* at 103). Ramirez's interaction with CBP was less than twenty-five minutes, and may have been closer to three to four minutes (*id.*; Doc. 238 at 10–11, 25).

This was Ramirez's only encounter with CBP (Doc. 238 at 18).

*Isaias Sanchez-Montejo.* Sanchez-Montejo arrived in the United States from Mexico in 2006 (Ex. 68 at 3). On June 28, 2012, Sanchez-Montejo was driving in Toledo, Ohio, with his brother in the passenger seat (Doc. 238 at 200–01). Sanchez-Montejo was driving a white Kia Optima sedan with a green driver's side door. The car belonged to a friend and Sanchez-Montejo had attached license plates he found in his garage (*id.* at 199, 216).

While stopped at an intersection, Sanchez-Montejo noticed a CBP patrol car stopped at the intersection, to his left (*id.* at 200). CBP Agents Thomas Payne and Jason Smith observed Sanchez-Montejo and his brother slump down in their seats and turn away (Doc. 241 at 86; Ex. 68 at 2). CBP ran a registration check on the car and determined it was a "hot-plated vehicle" -- the license plate did

8

not match the make and model of the vehicle (Doc. 241 at 87, 90; Ex. 68 at 2). Based on his law enforcement training, Payne knew that observing a subject slumping in a car seat may be "an indicator that possibly something . . . could be going on, because the general public typically does not do that" (Doc. 241 at 89). Payne also thought the car, the license plates, or both might be stolen, and knew from his experience that hot-plated vehicles are often used for smuggling (*id.* at 89–90).

Sanchez-Montejo pulled into a 7-Eleven gas station to purchase gas and to see if CBP would follow (Doc. 238 at 224). Payne did follow, and parked on the opposite side of the gas pump; the CBP cruiser did not block Sanchez-Montejo's vehicle (Doc. 241 at 91). When Sanchez-Montejo went into the 7-Eleven to pay for gas, Smith approached Sanchez-Montejo's brother who remained in the car (Doc. 238 at 203; Ex. 68 at 2). Sanchez-Montejo's brother was cooperative and admitted he was illegally present in the United States (Doc. 241 at 95–96; Ex. 68 at 2).

Sanchez-Montejo exited the 7-Eleven and began pumping gas. Payne approached Sanchez-Montejo and initiated a consensual encounter, asking questions about the vehicle and where Sanchez-Montejo was going. Sanchez-Montejo told Payne the car belonged to a friend and he was driving his brother to work (Doc. 238 at 204; Ex. 68 at 2). Sanchez-Montejo quickly became argumentative and uncooperative, questioning Payne's motives and refusing to answer his questions (Doc. 238 at 205–06; Doc. 241 at 92–93). Payne was standing behind Sanchez-Montejo's car, five to six feet away from him. At some point in the conversation, Sanchez-Montejo tried to get into his car to leave and Payne placed his hand on the car door to prevent Sanchez-Montejo from driving away. Payne asked Sanchez-Montejo for identification and Sanchez-Montejo presented a Mexican voter registration card (Doc. 238 at 204–08; Doc. 241 at 94). Sanchez-Montejo admitted to being present in the United States illegally. The agents took Sanchez-Montejo and his brother into custody for further processing (Ex. 68 at 2).

9

This was Sanchez-Montejo's only encounter with CBP (Doc. 238 at 219).

*Rosa Carrillo-Vasquez and Rocio Anani Saucedo-Carrillo.*[1]  Carrillo-Vasquez and Saucedo-Carrillo are mother and daughter who legally entered the United States from Mexico in January 2001 on six-month visitor visas (Ex. 63 at 3; Ex. 64 at 3; Doc. 239 at 20–21).  Carrillo-Vasquez and Saucedo-Carrillo are both IWP members (Doc. 239 at 4, 114).

On September 13, 2009, CBP Agent Bradley Shaver observed an old model, blue Chevrolet pickup truck parked at a gas station in Norwalk, Ohio.  The rear windows were tinted and had two silver scorpion decals with the words "Durango Durango."  The truck had flares on each side, blocking the view of the undercarriage, and vanity Ohio license plates with the name "Anani" (Saucedo-Carrillo's middle name) (Doc. 238 at 159–60, 178; Doc. 239 at 16, 50; Ex. 63 at 3; Ex. 64 at 3).

Shaver knew from his experience as a law enforcement officer that Durango is a state in Mexico known for cross-border drug trafficking, and scorpions are one of the logos used by drug-trafficking organizations.[2]  He also knew smugglers often used flares to hide narcotics in vehicles.  With that knowledge, and given that the truck was near an area of the Ohio Turnpike known as a drug corridor, Shaver thought the vehicle might be involved in narcotics smuggling and pulled into the gas station parking lot to investigate further.  Shaver's vehicle was between the food mart and the front of the truck, but was not blocking the truck from leaving.  Without knowing who was driving the truck, Shaver decided he wanted to speak with the driver (Doc. 238 at 161, 175, 189).

_____

[1]  This Court previously analyzed this encounter in a related action, *Saucedo-Carrillo v. United States*, 983 F. Supp. 2d 917 (N.D. Ohio 2013), *aff'd* 2015 WL 4773258, and granted Defendant's Motion for Summary Judgment.

[2]  Carrillo-Vasquez and Saucedo-Carrillo offer a benign explanation for the decals, explaining scorpions are a symbol of Durango, like the Buckeyes are to Ohio (Doc. 239 at 16, 51).

10

Shaver observed Carrillo-Vasquez seated in the passenger seat and Saucedo-Carrillo pumping gas.  Shaver approached the vehicle and, standing on the far side of the car, initiated a consensual encounter with Saucedo-Carrillo by asking if she owned the vehicle.  Saucedo-Carrillo replied she owned the car but could not register it in her name, which made Shaver curious (*id.* at 178).  Saucedo-Carrillo told Shaver she was originally from Mexico, was not a naturalized citizen, did not have a permanent resident card, and that she and her mother entered the United States in 2001 on ten-year visas (*id.* at 179; Ex. 64 at 3).  Shaver walked around the truck to speak with Carrillo-Vasquez, who remained seated in the vehicle.  Carrillo-Vasquez similarly explained she was from Durango, Mexico, and had entered the United States in 2001 on a ten-year visa.  Shaver asked Carrillo-Vasquez for photo identification, which she did not have (Doc. 239 at 17–20).  Although Shaver did not require Carrillo-Vasquez to answer questions, she felt she was not free to leave (*id.* at 18–19).

Suspecting the women had overstayed their visas, Shaver contacted Detroit Sector Dispatch for a records check based on their names and dates of birth.  Prior to receiving a response, the women admitted they entered the United States on six-month visas and had knowingly overstayed their visas.  Shaver arrested them and transported them to SBY for processing (Ex. 63 at 3; Ex. 64 at 3).

This was Carrillo-Vasquez's and Saucedo-Carrillo's only encounter with CBP (Doc. 239 at 26, 55).  As a result of her interaction with CBP, Saucedo-Carrillo avoids rest areas in the Sandusky area.  She used to take the Route 80 toll road when she would drive her father to Toledo for dialysis treatments.  Although the toll road is the fastest route, she takes an alternate path to avoid seeing CBP agents (*id.* at 47, 52–53).

*Rolando Aboytes-Bermudez.*  Aboytes, an IWP member, entered the United States from Mexico in 2007 on a work visa and began work as a landscaper (Doc. 240 at 3, 12).

11

On March 12, 2013, Aboytes and four Hispanic, male friends were returning to Cleveland after a trip to Chicago to renew their Illinois driver's licenses.  Aboytes believed he could not obtain an Ohio driver's license because of his immigration status.  The men were traveling in a black Infiniti sport utility vehicle with Ohio temporary tags.  The group stopped at a rest area in Vermilion, Ohio, to use the restrooms (*id.* at 4–5; Ex. 70 at 3).

Agents Santiago Mateo-Deleon and Alexander Chavez were patrolling the rest area, looking generally for suspicious vehicles potentially involved in human smuggling (Doc. 241 at 23–24).  The Agents exited the restroom and passed one of the men, with three of the others immediately behind him (*id.* at 27; Doc. 240 at 6).  The Agents perceived the men became uncomfortable in their presence -- they stopped speaking, failed to make eye contact with the Agents, mumbled a greeting to the Agents, and hastened to walk away (Doc. 241 at 27, 52–53).  Based on their law enforcement experience, the Agents knew that sometimes smugglers transporting large groups of people will only permit small groups to take restroom breaks so as not to raise suspicion (Ex. 70 at 2–3).  Chavez observed five or six vehicles in the parking lot and walked around each one.  The black Infiniti SUV caught his attention because of its size, tinted windows, and temporary tags (Doc. 241 at 24–28).  Chavez knew, based on his experience, that it is common for alien smuggling organizations to steal vehicles and replace the vehicle's tags to avoid detection (Ex. 70 at 3).  He peered into the vehicle with his flashlight and noticed it did not contain any luggage or baggage (Doc. 241 at 28).

Mateo initiated a consensual encounter with one of the individuals, who turned out to be the driver of the SUV.  When Aboytes returned to the car, the agents instructed him to stand behind the vehicle.  The agents asked each man where he was coming from and going to, and if he had permission to be in the United States.  Aboytes did not feel he could walk away while being questioned.  Aboytes presented his new Illinois driver's license, U.S. Social Security card and

12

Mexican passport (Doc. 240 at 9–11).  The men were vague as to their status in the United States, with some telling Chavez they had pending immigration petitions, and/or that a change in their status was in process.  Chavez contacted Detroit Sector Dispatch and requested immigration and criminal warrants record checks.  Mateo requested a vehicle registration check on the Ohio temporary tag.  Dispatch relayed to Mateo that all the individuals except for the driver were in the country illegally after overstaying their time of admission to the United States.  Mateo placed the three individuals under arrest (Ex. 70 at 3–5).

Before leaving, one of the men told Chavez there was a fifth friend traveling with them who was missing (Doc. 241 at 28–29).  The driver consented to Chavez searching the vehicle, and Chavez found the fifth man "sitting down in the third row seat of the SUV" "hiding underneath the last seat of the SUV" (Ex. 70 at 3–4; Doc. 241 at 29).  Aboytes testified the man "wasn't hiding" but rather "was sleeping" (Doc. 240 at 22).  The fifth individual told Mateo he was a Mexican citizen and presented a Mexican passport and a new Illinois driver's license.  After a check with Dispatch, the Agents determined the subject was in the country illegally and took him into custody with the others.

This was Aboytes' only encounter with CBP.  Though he has seen CBP agents on prior occasions, the agents never approached him (*id.* at 19).  As a result of his interaction with CBP, Aboytes avoids Ohio rest areas out of "fear of being discriminated against because of [his] Hispanic appearance" (*id.* at 14).

*Maria Martinez-Castro and Julio Basaldua-Nueva.*  Martinez entered the United States from Mexico in approximately 2001 (Ex. 72 at 3).  Basaldua, Martinez's husband, entered the United States from Mexico in 2004 (Ex. 73 at 3).

On February 23, 2011, Martinez was driving home from work with Basaldua and three other Hispanics, when a Wakeman police officer pulled her over for speeding.  Martinez does not speak or

understand English.  She did not have a valid driver's license, did not have any form of identification, could not produce registration documents for the vehicle (which belonged to a friend), and provided the officer an incorrect name and date of birth.  None of the other passengers spoke English or had identification (Doc. 240 at 41, 76–78, 109, 134).  The police officer requested CBP assistance to identify the passengers and translate (Exs. 71–73).  The police officer issued Martinez a citation and told her to wait for CBP.  Martinez and Basaldua would have left had the police officer not told her to stay (Doc. 240 at 52–54, 92).

After approximately thirty minutes, Agent Matthew Richardson arrived (Ex. 73 at 2).  After speaking with the police officer, Richardson approached Martinez and initiated an immigration inspection based on Martinez providing false information and because there were five individuals in the vehicle with no identification.  Richardson first asked Martinez for her name, and then repeatedly asked for her country of origin.  Martinez responded only that she was from Norwalk, Ohio (Doc. 240 at 41, 55–57, 79–80, 134–35).  She refused to tell him where she was born "out of intuition" (*id.* at 80).

Richardson next spoke with the man in the rear passenger side of the vehicle, who admitted to being illegally present in the United States.  Richardson asked him to get out of the car, and placed him under arrest (*id.* at 43, 59, 135–36).  Richardson then approached Rafael Fuentes-Valdez, also seated in the rear of the car, who similarly refused to answer questions and did not have any identification.  Richardson then decided to take all the passengers to the CBP station for further investigation and radioed for additional CBP assistance (*id.* at 136–37).

Richardson opened the passenger-side front door where Basaldua was seated and asked him to step out of the car and present identification (*id.* at 93–94).  He pushed Basaldua against the side of the car face-first, and handcuffed his arms behind his back.  He repeatedly asked Basaldua for his

14

country of origin, but Basaldua responded only that he was from Norwalk, Ohio.  Richardson removed Basaldua's wallet from his pocket and located a Mexican voter registration card, at which point Basaldua admitted he was unlawfully present in the United States (*id.* at 82–83, 94–95, 100, 108, 136).

Agent Adam Morgan arrived at the scene to assist.  Morgan and Richardson removed each of the five passengers from the vehicle, handcuffed them, escorted them to their patrol cars, and transported them to SBY for investigation and processing (*id.* at 58–60, 137–39).  This was Martinez's and Basaldua's only encounter with CBP (*id.* at 75, 110).

### Expert Testimony

*Dr. Kara Joyner.*  Plaintiffs presented the testimony of Kara Joyner, a Professor of Sociology at Bowling Green State University.  Joyner has a B.A., M.A., and Ph.D. in Sociology.  For six years, she served as Associate Director of the Center for Family and Demographic Research, and now teaches undergraduate and graduate level courses in statistics and demographic techniques (Doc. 238 at 30–31).  Plaintiffs did not move to certify Joyner as an expert in any field, and this Court admitted Joyner's reports over Defendant's objection (Doc. 239 at 80–83).  Joyner's honors, academic appointments and publications, qualify her as an expert in statistics (*see* Ex. 76 at 51–66).

Joyner prepared three reports analyzing SBY's Apprehension Logs (Exs. 74, 76, 99).  The Apprehension Logs document 2,857 apprehensions between October 1, 2008 and June 17, 2014 (Doc. 238 at 40; Ex. 76 at 4).  Joyner compared the nationality of individuals detained by SBY agents, as reflected on the Apprehension Logs, to a series of "benchmarks" based on publicly available population estimates and data concerning apprehensions at other CBP locations throughout the country.

15

Based on her analysis, Joyner concluded that Hispanic and Mexican representation in the SBY Apprehension Log is "high both in absolute and relative terms" (Ex. 76 at 17), and that in most years, the percent of SBY apprehensions involving a person of Hispanic national origin exceeds 90 percent (*id.* at 5, 23–24). According to 2012 population estimates based on census data, Ohio's foreign-born population is 18.4 percent Hispanic and 11 percent Mexican (*id.* at 7). For the same year, the Department of Homeland Security ("DHS") and Pew Research Center estimated Ohio's unauthorized population at 34 percent Mexican (Ex. 101 at 8). Although SBY's jurisdictional population includes a smaller percentage of Hispanic and Mexican individuals than the United States as a whole, Hispanic and Mexican representation in the SBY log resembles the national CBP apprehension log, and more closely resembles CBP stations on the southern border than stations in northern sectors (Ex. 77 at 2; Ex. 76).

Joyner calculated a "disproportionality index" of the Hispanic and Mexican representation in the SBY Apprehension Log compared to the benchmark population of Ohio's foreign-born Hispanic and Mexican populations (Doc. 238 at 46–47; Ex. 101 at 6). She concluded that compared to Ohio's overall foreign-born population, individuals from Hispanic countries are 5.8 to 7 times more likely to be apprehended by SBY agents, and Mexicans are 5.7 to 8.1 times more likely to be apprehended (Ex. 76 at 8; Doc. 238 at 44–47). Compared to Ohio's unauthorized population, Mexicans are overrepresented by factors of 2.6 to 3 (Ex. 76 at 9). It is Joyner's "professional opinion that the overrepresentation of Hispanics in the SBY log *must* be a consequence of targeting on the basis of Hispanic appearance" (*id.* at 17 (emphasis added); Doc. 238 at 43, 103–05).

*Dr. Brian Withrow.* Defendant offered the testimony of Brian Withrow, who presented a critical analysis of Joyner's report (Ex. 78). Withrow is an Associate Professor of Criminal Justice and Graduate Director at Texas State University–San Marcos. He is also Principal of Atticus

16

Analytics, a consulting firm for criminal justice agencies (Doc. 240 at 147; *see also* Ex. 78 at 55). Withrow has a B.A. in Criminal Justice, an M.A. in Public Administration, and a Ph.D. in Criminal Justice.  He worked twelve years with the Texas Department of Public Safety, starting as a trooper in the Traffic Law Enforcement Division and rising through the ranks to Bureau Manager of the Crime Records Division (Ex. 78 at 3–4).  With no objection from Plaintiffs, this Court accepts Withrow as an expert in racial profiling, police systems and practices, and social research methods (Doc. 240 at 152).

Withrow agrees with Joyner's mathematical computations, but highlights issues with the assumptions she makes, calling into question the general reliability of her statistical analysis.  The numerator in Joyner's disproportionality index calculation is based on the SBY Apprehension Log, which contains only those individuals arrested after SBY agents made a finding of probable cause. The Apprehension Log does not include information on non-arrest stops (Doc. 238 at 43–44).  To determine whether SBY agents were treating Hispanics differently than other groups, Joyner would have had to look at the entire population of individuals SBY agents encounter -- not just those apprehended -- and evaluate how all individuals are treated.  By using the Apprehension Log, Joyner's analysis measured SBY agents' activities at the wrong point in time (*see* Doc. 240 at 174–76).  Joyner also did not account for OA Stops in the Apprehension Log, which she acknowledged cannot be based on agents' racial profiling considering CBP does not initiate the encounter (Doc. 238 at 119–21).

Joyner's method of determining the benchmark population, the denominator in the disproportionality index, is also unreliable.  First, Withrow explained it is "exceedingly difficult" to measure foreign-born and unauthorized populations, and the Census Bureau routinely undercounts them (Doc. 240 at 167).  Second, Joyner took national estimates and reduced them to the relatively small geographic area of SBY's jurisdiction -- Northern Ohio.  As Withrow explains, "the potential

17

for having error in the sample is very high when you drill it down to a small geographic area" (*id.* at 168–71; Doc. 241 at 10–11). Third, Joyner's benchmarks rely on three key assumptions: (1) Hispanic and Mexican representation in SBY's jurisdiction matches their representation in Ohio; (2) Hispanic and Mexican representation is similar among unauthorized populations traveling throughout Ohio; and (3) unauthorized Hispanics and Mexican citizens do not differ from unauthorized persons of other national origins with respect to traffic violations (Doc. 241 at 6–7). In Withrow's opinion, those assumptions are "purely guesses on her part," unsupported by any scientific bases because "we do not have a solid sense of what the population is" (*id.* at 7). And even assuming Joyner's analysis is not flawed, there is no scientifically recognized standard for determining whether overrepresentation at a certain level is due to racial profiling (*id.* at 5; Ex. 78 at 17). Fourth, and perhaps most importantly, Joyner's analysis fails to consider reasonable alternatives, such as "the impact of enforcement aggressiveness on overall productivity" (Ex. 78 at 13). Specifically, from 2008 to 2011, SBY "increased its patrol strength from approximately eight to more than fifty agents" (*id.*). This more than five-fold increase in patrol strength legitimately resulted in an increase in immigration detainments and deportations from the northern Ohio area (*see id.* at 12–13; Doc. 240 at 161–63, 173).

Finally, Joyner's ultimate conclusion that SBY agents "must" be targeting individuals for stops based on their "Hispanic appearance" is unsupported by her methodology. As Withrow explained, Joyner assumes, without any support, that the agents "knew the ethnicity of the individual arrested prior to initiating the enforcement action" (Doc. 240 at 160). This Court finds it troubling that Joyner admitted she was speculating in forming her conclusion and "making a little bit of a jump" (Doc. 238 at 104–05). Joyner conceded she did not have any data concerning the appearances of the individuals included in the Apprehension Log and could only testify that a "Hispanic appearance" is "something like are they speaking Spanish, because that can be part of it" (*id.* at 104). This Court does not need,

18

but appreciates witness testimony that nationality does not determine ethnicity and that individuals documented as being from a Hispanic country of origin do not all look the same (*see* Doc. 236 at 164–65; Doc. 239 at 29–30; Doc. 240 at 178). This glaring error in Joyner's ultimate conclusion taints her testimony and makes her analysis unreliable.

This Court finds Withrow a more reliable expert than Joyner. While Joyner has a sophisticated understanding of statistics, she presented a limited understanding of the practical implications of her analysis. Withrow demonstrated a deeper understanding of the real-world meaning of Joyner's analysis and identified serious flaws in her methodology.

### CONCLUSIONS OF LAW

**Standing**

Defendant argues Plaintiffs lack standing to sue under the circumstances of this case. Plaintiffs assert two distinct theories of standing: standing to sue on their own behalf for alleged injuries to their organizations, and standing to sue on behalf of their members (Doc. 232 at 12–13).

To prove Article III standing, Plaintiffs must allege: (1) an injury in fact; (2) a causal connection between the injury and the challenged conduct that is fairly traceable to CBP's actions; and (3) that the requested relief will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). A drain on an organization's resources constitutes a "concrete and demonstrable injury for standing purposes." *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)).

At a minimum, Plaintiffs have established standing to sue on their own behalf by demonstrating they have diverted resources to counteract CBP enforcement activities. Jeff Stewart, IWP Coordinator, testified on behalf of the organization. Prior to 2009, the IWP allocated twenty-five to thirty percent of its resources to immigration issues. After SBY opened in 2009, as members

19

reported an increase in CBP encounters based on perceived racial profiling and stricter enforcement of immigration laws, IWP increased its focus on immigration issues. IWP now allocates approximately seventy to seventy-five percent of its time to immigration issues, to the detriment of the organization's other programs (Doc. 236 at 183–84). IWP spent $3,000–$7,000 each year since 2009 on legal fees to preserve the rights of undocumented workers (*id.* at 186–87, 197–98; *see also* Ex. 104 at 5–7; Ex. 106 at 6). IWP also incurs costs in accepting collect calls from individuals detained by CBP on civil immigration matters (Ex. 106 at 6; Doc. 236 at 193).

Similarly, FLOC President Velasquez testified that shortly after SBY opened in 2009, FLOC instituted a system for responding to members' inquiries and concerns regarding immigration issues (Doc. 236 at 124–29). FLOC investigates members' complaints regarding improper CBP tactics, which includes traveling to locations where CBP agents are alleged to be targeting Hispanics (*id.* at 150–51). Since 2009, FLOC has suffered a decline in its Ohio membership from 2,500 members to just over 1,000 members, which corresponds to a decline in revenue (*id.* at 131). In response to members' fears of encountering CBP while traveling through Ohio, FLOC hired charter buses to transport members to its 2009 convention in Toledo (*id.* at 147–48; Ex. 9).

Plaintiffs have sufficiently alleged an injury in fact. Their claims against Defendant are based on their organizational interests, which have been negatively affected by CBP's increased enforcement. CBP's alleged constitutional violations prevent Plaintiffs from performing the full extent of their daily operations. *See American Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Com'n*, 389 F.3d 536, 546–47 (6th Cir. 2004).

**Fifth Amendment "Racial Profiling" Claims**

Plaintiffs allege SBY agents violate Hispanic individuals' Fifth Amendment[3] rights to due process and equal protection of the law by discriminating against them on the basis of their race (*see* Doc. 143 at ¶¶ 264–66 (Due Process Claim); ¶¶ 267–69 (Equal Protection Claim)).  These distinct claims in the Complaint reduce to a general allegation that SBY agents are engaged in a pattern of racial profiling against Hispanics.  In analyzing Plaintiffs' claims, this Court employs the definition of "racial profiling" adopted by DHS: racial profiling is "the invidious use of race or ethnicity as a criterion in conducting stops, searches and other law enforcement activities.  It is premised on the erroneous assumption that any particular individual of one race or ethnicity is more likely to engage in misconduct than any particular individual of another race or ethnicity" (Exs. 126, 130).

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954)).  Law enforcement officers cannot select individuals for investigation solely on the basis of race or ethnic origin, regardless of whether the treatment is pursuant to a lawful investigation, detention, or arrest. *See Farm Labor Org. Comm. v. Ohio State Hwy. Patrol*, 308 F.3d 523, 533 (6th Cir. 2002).  To prove a Fifth Amendment violation, Plaintiffs must demonstrate by a preponderance of the evidence that SBY maintains a policy or custom that had a discriminatory effect on Hispanics, and was motivated

---

[3] Although some of the cited cases construe the Fourteenth Amendment, those cases are authoritative when adjudicating a Fifth Amendment claim. *See United States v. Stewart*, 306 F.3d 295, 308 n.2 (6th Cir. 2002) (noting the Due Process Clauses of the Fifth and Fourteenth Amendments are "analogous"); *Medical Mut. v. deSoto*, 245 F.3d 561, 575 (6th Cir. 2001) ("[T]he language and policies behind the Due Process Clause of the Fourteenth Amendment are essentially the same as those behind the Due Process Clause of the Fifth Amendment."); *Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.").

by a discriminatory purpose.  *See Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005); *United States v. Avery*, 137 F.3d 343, 356 (6th Cir. 1997) ("a factually supported record of the selection for interview because of race, [or] a general practice or pattern that primarily targeted minorities for consensual interviews . . . would have given rise to due process and equal protection constitutional implications cognizable by this court") (internal quotation omitted).  Plaintiffs contend that "a combination of statistical evidence, [anecdotal] evidence presented by the individual witnesses and the racially charged language utilized by SBY agents themselves establishes that the [CBP's] enforcement activity had a discriminatory effect and that it was motivated by a discriminatory purpose" (Doc. 232 at 13) (internal quotation omitted).

*Anecdotal Testimony.*  The eight CBP encounters (discussed above) fail to show that CBP has a practice of racially profiling Hispanics.  Three of the encounters were OA Stops.  Both of Bautista's interactions with CBP were the result of local law enforcement requesting CBP assistance at the scene of a traffic accident to identify Bautista and translate.  Martinez was stopped by local police for speeding, and there is no evidence the officer was profiling her, Basaldua, or any of the other occupants of her vehicle when they requested CBP assistance.

Immigration agents are required to respond to requests by state officials for verification of a person's citizenship or immigration status.  8 U.S.C. § 1373©; *see also Arizona v. United States*, 132 S. Ct. 2492, 2508 (2012) (recognizing that "[c]onsultation between federal and state officials is an important feature of the immigration system").  Plaintiffs have not shown SBY maintains a policy or custom of only responding to OA calls involving Hispanic motorists.  CBP agents testified that when dispatched to assist local police, they generally do not know the reason local law enforcement is requesting assistance (*see* Doc. 241 at 78–79) ("Generally there's not a whole lot of information that . . . we have at that time").  Joyner admitted she should have excluded data regarding OA Stops from

her analysis because, in those encounters, CBP agents are not deciding who to stop (Doc. 238 at 118–23).

Nor does the testimony regarding the other five CBP encounters support Plaintiffs' claim. Consensual encounters may violate the Equal Protection Clause when they are initiated solely based on racial considerations. *United States v. Travis*, 62 F.3d 170, 173–74 (6th Cir. 1995) (discussing *United States v. Jennings*, 985 F.2d 562 (6th Cir. 1993)). However, the evidence demonstrates the apprehending agents initiated these encounters based on factors unrelated to racial or ethnic appearances.

• Agent Shaver began a consensual encounter with Perez-Perez based on information Perez-Perez fled the scene of a traffic accident when he learned CBP had been called to assist (Doc. 238 at 166–68, 192). Perez-Perez's behavior, not his race, caused Agent Shaver to investigate.

• Montez-Ramirez assumes, without support, that Agent Payne stopped him because he saw his skin color and recognized him to be Mexican (*id.* at 22, 277–78). Payne investigated Montez-Ramirez based on his initial observation that a male was driving a female passenger in a large van with tinted windows in an area known for human trafficking. He further observed the van driving away from an area with trailers with the passenger door open (Doc. 241 at 101–04). Montez-Ramirez's race was not a factor in Agent Payne's decision to investigate.

• Agent Payne began his investigation of Sanchez-Montejo because of the condition of the vehicle, not because of the passengers' Hispanic appearance. While Sanchez-Montejo testified he "exchanged eye contact" with the agents at the intersection, he acknowledges he was wearing sunglasses and Payne testified he could not see what the passengers looked like because they slumped down in their seats and turned their bodies away from him (Doc. 238 at 199–200; Doc. 241 at 86).

23

Payne initiated the consensual encounter with Sanchez-Montejo only after confirming the vehicle was hot-plated, which in his experience suggested it was involved in criminal activity.

•    Agent Shaver observed Saucedo-Carrillo's truck at the gas station and decided he wanted to speak with the driver, without knowing if it was anyone of Hispanic nationality, because of the type of vehicle, the tinted windows, and the "Durango Durango" decals (Doc. 238 at 161, 175, 189).

•    Agent Chavez did not investigate Aboytes and his friends based on their Hispanic appearance.  He first noticed their suspicious behavior when he passed them near the restroom, and later connected them to the large SUV that caught his attention because of its size, tinted windows, temporary tags, emptiness, and location near a route known for smuggling (Doc. 241 at 27–28).

*Statistical Evidence.*  Even if the facts presented are sufficient to infer a discriminatory intent, Plaintiffs do not provide evidence of discriminatory effect through Joyner's analysis of SBY Apprehension Logs.  Although statistical analysis could be considered as evidence of discrimination, "[o]nly in rare cases will a statistical pattern of discriminatory impact conclusively demonstrate a constitutional violation."  *Avery*, 137 F.3d at 357 (affirming district court's rejection of statistics to prove discrimination).  Courts are generally cautious to rely on statistical evidence to show discriminatory purpose.  *See United States v. Alcaraz-Arellano*, 302 F. Supp. 2d 1217, 1233–34 (D. Kan. 2004) (finding racial profiling study was not relevant or reliable), *aff'd* 441 F.3d 1252 (10th Cir. 2006).

As explained above, there are numerous problems with Joyner's analysis, and Withrow's criticism is well supported and well taken.  Joyner incorrectly assumes the rules of probability apply to the manner in which CBP agents select individuals for enforcement.  As Withrow explains, CBP does not select individuals randomly and not all people within an enforcement area are equally likely

24

to be selected for enforcement (Ex. 78 at 19). Joyner claims there is a causal link between ethnic bias by SBY agents and over-representation of Hispanics within the Apprehension Log. But, "proving racial profiling is more complicated than mere ratio comparisons;" a causal relationship must be established, and the cause must precede the effect while eliminating alternative explanations (*id.* at 16; *see also* Doc. 240 at 160) ("If you're going to allege that ethnicity is the cause of the arrest, then you must establish that the officer knew the ethnicity of the individual arrested prior to initiating the enforcement action"). In Withrow's opinion, "it would seem logical [that] a law enforcement agency tasked with the duty to apprehend unauthorized immigrants would report arresting a large number of individuals from the ethnic group representing the largest proportion of unauthorized immigrants" (Ex. 78 at 20). By relying only on the Apprehension Log, which includes OA Stops and does not include data regarding consensual encounters and other SBY enforcement actions, Joyner's analysis produces an "incomplete and misleading measure" of SBY's performance (*id.*). *See Travis*, 62 F.3d at 175–76 (discounting statistical analysis of "incident reports" compiled by law enforcement officers as "not a reliable basis for an inference of discrimination" where reports do not include all consensual encounters).

*SBY Record Keeping.* Plaintiffs argue SBY's failure to record consensual encounters and the "woefully inadequate records of its enforcement activities" is part of the problem (*see* Doc. 243 at 17). Yet Joyner could have collected that data through field observations, interviews, or other methods. And as Defendant points out, "[i]t may well be that agencies like the Border Patrol would be better able to defend racial profiling allegations if they recorded more data, but that is [a] decision that the Executive Branch, vis-à-vis DHS-CBP, must be allowed to make given their own limited resources" (Doc. 244 at 17 n.6). The absence of data regarding the full extent of SBY's enforcement activities is not affirmative evidence of racial profiling.

25

*Use of Term "Wetback."*  Plaintiffs introduced internal e-mail communications between CBP agents using the term "wet" or referring to Hispanic individuals as "wetbacks" as evidence of a culture of racial animus at SBY.  Historically, the term "wetback" referred to people crossing the Rio Grande River from Mexico into the United States (Doc. 237 at 160).  The parties dispute whether the term is an ethnic slur for Hispanics, a derogatory description of an undocumented alien regardless of race or national origin, or both (*see id.* at 33–34 (Bammer testified "wet" was used on the southern border to refer "to an illegal status . . . it was universal as far as . . . what nationality, didn't refer to a specific culture or country of origin"); Doc. 241 at 35–36 (Chavez testified "wet" refers to "someone that is in the country illegally . . . of any ethnicity")).  Either way, CBP concedes it has a negative connotation, and that directives prohibiting its use (*see* Exs. 96–97) should have been followed.

However, the occasional use of the word is insufficient to support a conclusion of racial profiling.  Carrillo-Vasquez is the only motorist to testify a CBP agent used the term "wet" in speaking with her, asking if she "knew where more wets worked" (Doc. 239 at 12).  Bautista and Martinez each overheard an agent use the term "wet," but it was not specially directed at them (*see* Doc. 236 at 40; Doc. 240 at 64).  Three motorists testified to isolated incidents of post-arrest mistreatment by CBP agents: agents yelled at Martinez and spoke to her in a rude manner (Doc. 240 at 63); agents escorted Carrillo-Vasquez to a bathroom where there was a dog and a male agent outside the stall (Doc. 239 at 35); Sanchez-Montejo was detained at the SBY station for eleven hours without food (Doc. 238 at 742).  And yet, most of the motorists acknowledge the officers were polite and did not use any ethnic or racial slurs (Doc. 236 at 110 (Perez-Perez); Doc. 238 at 12–13 (Ramirez); Doc. 238 at 221 (Sanchez-Montejo); Doc. 239 at 28 (Carrillo-Vasquez); Doc. 240 at 19–20 (Aboytes); Doc. 240 at 70–71 (Martinez)).  The few times the term appears in what presumably were hundreds or thousands of emails exchanged in discovery (*see, e.g.*, Exs. 10–13, 55–56) represent

isolated instances of poor judgment and do not substantiate Plaintiffs' claim of a culture of racial animus at SBY. Multiple witnesses testified CBP strictly enforces its prohibition of the phrase, it is "no longer part of the Border Patrol culture," and agents who had used the term have been counseled by supervisors not to use the term (Doc. 237 at 32–33; Doc. 241 at 40–41; Doc. 242 at 23). To the extent it was used at some point in time, its use is not "so permanent and well settled as to constitute a custom or usage with the force of law." *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507–08 (6th Cir. 1996).

*CBP Training Procedures.* Plaintiffs argued at trial there "is a completely absent effort [at SBY] to train people to avoid racial profiling" (Doc. 240 at 119). But the evidence at trial presented that agents received racial profiling training, as well as training on protocol for stops and seizures (*see, e.g.*, Doc. 241 at 82–83). Mario Martinez, Chief of the Detroit Sector, does not tolerate racial profiling and would not permit any agent to initiate a consensual encounter based solely on a person's race (Doc. 242 at 10–12, 15). DHS, of which CBP is part, has adopted the Department of Justice's "Guidance Regarding the Use of Race by Federal Law Enforcement Agencies," issued in June 2003. That policy "prohibit[s] the consideration of race or ethnicity in our daily law enforcement activities in all but the most exceptional instances, as defined in the DOJ Guidance," and permits personnel to "use race or ethnicity only when a compelling governmental interest is present" (Ex. 125; *see also* Exs. 126–28).

Plaintiffs failed to establish a policy or practice by CBP agents of constitutional violations. The evidence presented, at best, a handful of distasteful incidents. But that certainly does not rise to the level necessary for this Court to impose equitable relief on CBP and to assume the role of monitoring. Each of the individual witnesses testified these were the only encounters they have had with CBP agents (*see* Doc. 236 at 83 (Bautista); Doc. 236 at 101 (Perez-Perez); Doc. 238 at 18

27

(Ramirez); Doc. 238 at 219 (Sanchez-Montejo); Doc. 239 at 26 (Carrillo-Vasquez); Doc. 239 at 55 (Saucedo-Carrillo); Doc. 240 at 19 (Aboytes); Doc. 240 at 75 (Martinez); Doc. 240 at 110 (Basaldua)). There is no "imminent threat of irreparable harm" to justify an injunction against the SBY station. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 95 F. Supp. 2d 723, 732 (N.D. Ohio 2000) ("Whether the named plaintiffs are likely to be stopped again by the Border Patrol is simply too speculative to warrant an equitable judicial remedy, including declaratory relief, that would require, or provide a basis for requiring that the Border Patrol change its practices") (internal quotation omitted).

### Fourth Amendment Claim

Plaintiffs allege SBY agents systematically violate the Fourth Amendment through a pattern and practice of unreasonable detentions (Doc. 143 at ¶¶ 262–63). First, Plaintiffs claim SBY agents routinely initiate "nominally 'consensual' encounters with the aim of developing the reasonable suspicion necessary to escalate to a non-consensual immigration inspection" (Doc. 243 at 19). Though Plaintiffs admit this law enforcement strategy is permissible, they take issue with SBY's implementation. Second, Plaintiffs argue routine stops initiated by local law enforcement agencies are extended for the sole purpose of summoning SBY agents to investigate immigration status (*id.* at 20).

There are three types of permissible encounters between law enforcement and citizens: a consensual encounter, an investigative detention or seizure, and an arrest. *United States v. Waldon*, 206 F.3d 597, 602–03 (6th Cir. 2000). A consensual encounter "may be initiated without any objective level of suspicion." *Id.* at 602 (citing *Avery*, 137 F.3d at 352). An investigative detention or seizure of the person "if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity." *Id.* And an arrest is "valid only if supported by probable cause." *Id.*

For a seizure to occur under the Fourth Amendment, "the encounter must not be consensual and the officers must use physical force or the individual must submit to the officers' show of authority." *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010). Additionally, to constitute a seizure, the individual's freedom must be restrained. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon the person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Id.*

Plaintiffs adduce no evidence that the five encounters CBP agents initiated through consensual encounters improperly advanced to immigration interrogations or escalated to seizures without the requisite level of reasonable suspicion or probable cause. Law enforcement officers can approach an individual, ask for identification, and pose a few questions without intruding on any constitutionally protected interest. *Id.* at 555; *see United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007) (law enforcement does not need reasonable suspicion or probable cause to question individuals). That the questions relate to an individual's immigration status or identification does not transform a consensual encounter into a seizure. *See INS v. Delgado*, 466 U.S. 210, 219 (1984). Officers may ask for identification, provided they do not condition the person's departure on its production "or convey a message that compliance with [the] request is required." *United States v. Hinojosa*, 534 F. App'x 468, 470–71 (6th Cir. 2013) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

The anecdotal testimony regarding the five encounters initiated by CBP agents (again, discussed above) does not support Plaintiffs' claim.

•       Agent Shaver's questioning of Perez-Perez is a textbook consensual encounter, with Perez-Perez feeling he had the option not to answer and walk away (Doc. 236 at 97–98). This type

of encounter is not a seizure.  When asked, Perez-Perez admitted he was illegally present, at which point Shaver had probable cause to arrest him (*see id.* at 110; Ex. 4 at 3).

• Agent Payne did not even stop Montez-Ramirez, let alone seize him (Doc. 241 at 102–06).  Payne never asked Montez-Ramirez any immigration questions and, satisfied with the answers, told him to "have a nice day" (*id.* at 103).

• Agent Payne did not unreasonably seize Sanchez-Montejo.  Payne did not approach Sanchez-Montejo until after solid confirmation the vehicle was hot-plated, giving him reasonable suspicion of some criminal activity.  When Payne pulled into the gas station, he did not block Sanchez-Montejo's car.  Payne prevented Sanchez-Montejo from leaving only after he became uncooperative. Sanchez-Montejo eventually admitted he was unlawfully present in the United States, at which point Payne had probable cause to arrest him (*id.* at 87, 90–94; Doc. 238 at 204–08; Ex. 68 at 2).

• Agent Shaver did not unreasonably seize Saucedo-Carrillo or Carrillo-Vasquez.  He initiated a consensual encounter, never told them they could not leave, and did not condition their departure on production of identification or compliance with his questions (Doc. 238 at 178–79). After Shaver learned they were in the country illegally, he had probable cause to arrest them.

• Agent Chavez did not unreasonably seize Aboytes.  Aboytes and his companions acted suspiciously in the presence of the CBP agents (Doc. 241 at 27, 52–53).  When the agents learned Aboytes was in the country illegally, they had probable cause to arrest him.

Plaintiffs fail to show CBP agents encourage local officers to detain anyone, let alone prolong detentions.  To the contrary, Agent Corey Bammer, patrol agent in charge of the Detroit Sector, testified CBP's policy is that local law enforcement must have authority to hold the suspect for its

30

own enforcement purposes, and CBP would not request officers hold a suspect absent probable cause (Doc. 237 at 120–22).  The anecdotal evidence from the agents involved in OA Stops confirms this.

- Both of Bautista's encounters with CBP were precipitated by requests from local law enforcement officers investigating automobile accidents to assist in identifying Bautista and translating for him.  Bautista admitted he spoke limited English and needed another person to translate for him when speaking with the highway patrol officer (Doc. 236 at 61–62, 66).  In the first encounter, he presented the officer a driver's license form New Mexico and was driving a car with Wisconsin license plates even though he admitted he was an Ohio resident (*id.* at 59–60).  It was reasonable for Agent Rosenberg to ask Bautista some preliminary questions without cause.  *See Mendenhall*, 446 U.S. at 553 ("The purpose of the Fourth Amendment is not to eliminate all contact between the police and citizenry.").  Once Rosenberg determined Bautista was illegally present in the United States, he had probable cause to arrest him.  In the second encounter, Bautista presented a document unfamiliar to the Huron police officer; Agent Shaver contacted CBP dispatch to verify the document was valid and, once he did so, told Bautista he was free to go  (Doc. 238 at 166).

- Agent Richardson did not unreasonably prolong the seizure of Martinez or Basaldua.  The Wakeman police officer requested CBP assistance to identify five occupants in the vehicle, none of whom spoke English, had any identification, and refused to provide their names.  Martinez and Basaldua refused to answer Richardson's questions.  One of the passengers immediately admitted he was unlawfully present in the United States, and Basaldua did so later, giving Richardson probable cause to arrest them (Doc. 240 at 134–36).

Plaintiffs fail to establish that CBP has a policy or practice of escalating consensual encounters through immigration interrogations or encouraging local law enforcement officers to unconstitutionally prolong their investigations.

## CONCLUSION

The eight CBP encounters over a period of six years that were the focus of testimony at trial do not support the allegation that CBP has a policy or custom of racial profiling and unlawful seizures.  Plaintiffs have not shown by a preponderance of the evidence that Defendant committed any constitutional violations, or that any of the alleged violations were the result of Defendant's custom or policy.  For the foregoing reasons, this Court finds in favor of Defendant on all claims.

IT IS SO ORDERED.

_____s/ Jack Zouhary_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

February 24, 2016